IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA KOCH, | : | |
| Plaintiff, | : | CIVIL ACTION NO. 16-4857 |
| v. | : | |
| MACK TRUCKS, INC., | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                                                    June 1, 2018

A sales engineer for a truck manufacturing company brought this action against her employer alleging, *inter alia*, gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act. After a trial, the jury found that the employer had violated those laws by failing to promote the plaintiff based on her gender and retaliating against her for complaining about discrimination. The jury awarded her compensatory damages and determined on an advisory basis the amount of front pay and back pay to award. In an action tried on the facts with an advisory jury, Federal Rule of Civil Procedure 52 requires the court to find the facts specially and state conclusions of law separately. Accordingly, the court makes the following findings of fact and conclusions of law, determining that the plaintiff is entitled to $6,823.08 in back pay and no front pay.

### I.   FINDINGS OF FACT

#### A.   Melissa Koch's Initial Years With Mack Trucks, Inc.

The plaintiff, Melissa Koch ("Koch"), began working for the defendant, Mack Trucks, Inc. ("Mack"), in April 1997. Trial Tr. Dec. 12, 2017, at 46, Doc. No. 97. She first worked at Mack's Winnsboro, South Carolina plant, building highway trucks as a process technician on the chassis line. *Id.* at 46–48. After one-and-a-half to two years, Mack promoted her to the

production supervisor position on the cab line, where 20 to 25 employees reported to her. *Id.* at 50–52. Koch then transferred to different Mack facilities twice in the following eight years—first to the New River Valley, Virginia plant in July 2002, and then, following a five-month voluntary layoff, to the Macungie, Pennsylvania plant in May 2010. *Id.* at 52–53, 57–59. When Koch arrived in Macungie, she was the only woman in production management, which included, in ascending order of authority, at least 30 production supervisors, six business team leaders, one business unit manager, one director of operations, and one plant manager. *Id.* at 62–65; Trial Tr. Dec. 18, 2018, at 152–54, Doc. No. 103.

### B. Mack's Failure To Promote Koch To Business Team Leader

Soon after arriving at the Macungie plant, Koch began working as a first-shift production supervisor on the cab line, reporting to Jon Tosh ("Tosh"), a business team leader. Trial Tr. Dec. 12, 2017, at 62–63, 88. Approximately 12 to 15 times each year between the end of 2011 and 2013, Koch covered some of Tosh's duties when he was absent. *Id.* at 63–64, 132; Trial Tr. Dec. 13, 2017, at 202–04, Doc. No. 98. The duties Koch covered included schedule evaluation, manpower placement, and safety and union issues on the cab line—key items that would make the plant successful for the day. Trial Tr. Dec. 13, 2017, at 203–05. Over the course of 2014, Koch covered some of Tosh's duties more often, a total of two to three months, because Mack intermittently relocated Tosh to better assist production in a low-performing paint department. Trial Tr. Dec. 12, 2017, at 132–33, 138; Trial Tr. Dec. 13, 2017, at 146, 204, 213, 226.

In December 2014, a "cliff event" in the paint department caused Mack to shut down the plant numerous times and relocate Tosh to the paint department on a "long term temporary" basis. Trial Tr. Dec. 12, 2017, at 138–39; Trial Tr. Dec. 13, 2017, at 147; Trial Tr. Dec. 18, 2017, at 133–34. Jim Flannery, the plant's director of operations at the time, told Koch that Tosh's relocation would be short term, "a few months." Trial Tr. Dec. 12, 2017, at 138. Koch

2

"knew it was going to be longer," although not permanent, and Tosh told her he also had a feeling the relocation would be "long term temporary." Trial Tr. Dec. 13, 2017, at 147. Nevertheless, Tosh and others expected him to return to his position as business team leader over the cab line. *Id.* at 227; Trial Tr. Dec. 14, 2017, at 15, Doc. No. 101. Tosh did in fact return to his former position around September 2015. *See* Trial Tr. Dec. 12, 2017, at 138–39 (Tosh's relocation lasted until at least the end of July 2015); Trial Tr. Dec. 14, 2017, at 15–19 (explaining that Tosh returned to his former position in 2015 around the time that Kevin Duchala retired and Brad Ibach moved to first shift to replace Duchala in late 2015); Trial Tr. Dec. 18, 2017, at 145 (explaining that Duchala retired during the third quarter of 2015, likely in September); *but see* Trial Tr. Dec. 14, 2017, at 186 (Tosh's relocation lasted only three to six months).

Rather than promote Koch to Tosh's temporarily vacated position, Mack reorganized its existing business team leaders' responsibilities. Trial Tr. Dec. 12, 2017, at 138; Trial Tr. Dec. 13, 2017, at 149. Prior to Tosh's transfer, three business team leaders worked at the Macungie plant in assembly on first shift, none of whom worked in the paint department: Tosh, Kevin Duchala ("Duchala"), and Aaron Shay ("Shay"). Trial Tr. Dec. 13, 2017, at 144–46. Following Tosh's transfer to the paint department, Shay assumed Tosh's vacated position as business team leader over the cab line, and Duchala assumed Shay's responsibilities as business team leader over one of the chassis lines, while also retaining his prior responsibilities. Trial Tr. Dec. 12, 2017, at 139; Trial Tr. Dec. 13, 2017, at 147–49 (Duchala "absorbed one [spot]."). Although Shay assumed Tosh's former position, Koch continued to cover some of Tosh's former duties and taught Shay about the cab line, of which he had no experience. Trial Tr. Dec. 12, 2017, at 138–40; Trial Tr. Dec. 13, 2017, at 211–12. Specifically, Koch still helped supervisors with manning issues in the morning and answered their questions, while Shay managed paperwork.

*Id.* Mack never solicited applications for Tosh's vacated position. Trial Tr. Dec. 12, 2017, at 138; Trial Tr. Dec. 13, 2017, at 148–49. Koch testified that if Tosh's position "was going to be temporarily filled, let me temporarily fill it." Trial Tr. Dec. 13, 2017, at 148. The jury agreed and found that Mack's failure to promote Koch to Tosh's vacated business team leader position in December 2014 violated Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").

### C. Koch's Transfer Out Of The Macungie Plant

After Mack reorganized its first-shift business team leaders in December 2014, Koch received a lateral transfer to Mack's offices in Allentown, Pennsylvania as a sales engineer in July 2015. Trial Tr. Dec. 13, 2017, at 23, 94–95; Trial Tr. Dec. 15, 2017, at 173, Doc. No. 102. During her sales engineer interview, Koch explained that the position provided her with an opportunity to work in a less stressful, sedentary, and climate-controlled environment—a better work environment for her multiple sclerosis ("MS") condition. Trial Tr. Dec. 18, 2017, at 39–40. Had Koch instead received the business team leader promotion, she likely would have worked at least partially in an office environment, as evidenced by other business team leaders having offices, completing paperwork, creating charts and graphs, and attending meetings. *See* Trial Tr. Dec. 12, 2017, at 134–36, 139–41; Trial Tr. Dec. 13, 2017, at 136, 183. At trial, Koch explained that gender discrimination motivated her to leave the Macungie plant:

> I could not deal with what was going on in the plant anymore. It was evident there were no more changes. It was still making my MS worse, with my legs and everything else. I wanted out. At that point, if you had offered me a janitor's position, I would have probably considered it.

Trial Tr. Dec. 13, 2017, at 23; *see also id.* at 23–24, 50–51 (clarifying that "changes" refer to any progress in promoting Koch or other women); *id.* at 47–48 (explaining that the stress associated with Koch's complaints in this suit, and not plant environmental conditions, caused her MS to

progress). Therefore, although Koch wanted to leave the Macungie plant for environmental reasons unrelated to gender discrimination, she nevertheless would have remained at Macungie but for Mack's failure to promote her.

### D. Mack's Consideration Of Koch For Other Promotions

Between August 2014 and September 2016, Koch applied for at least 14 promotions, and Mack denied her each. Trial Tr. Dec. 13, 2017, at 39–40. At trial, Koch did not submit evidence of the successful applicant's qualifications relative to her own for any of the positions to which she unsuccessfully applied.[1] For two of those promotions, the technical preparation engineer in October 2014 and product introduction engineer in March 2015, Mack's hiring managers chose male applicants over Koch based on superior education credentials and more relevant experience within Mack or its parent, Volvo. *See* Trial Tr. Dec. 12, 2017, at 45; Trial Tr. Dec. 13, 2017, at 9–10; Trial Tr. Dec. 14, 2017, at 30–32; Trial Tr. Dec. 15, 2017, at 203–07, 210; Def. Exs. 41, 44. Based on this record, the court finds that the jury considered these promotion denials lawful and limited its failure-to-promote verdict to the business team leader position vacated by Tosh.

### E. Koch's Rejection Of Promotion Opportunities

In the spring of 2015, after Mack failed to promote Koch to business team leader for the cab line in December 2014, Koch declined a promotion offer. Although one of Mack's hiring managers rejected Koch for the product introduction engineer – cab position, he instead interviewed her for the product introduction engineer – chassis position in March 2015. Trial Tr. Dec. 13, 2017, at 9–11; Trial Tr. Dec. 15, 2017, at 207–14. Koch expressed reservations about the position because she believed working on the chassis line would expose her to heat that would exacerbate her MS, she lacked chassis experience, and any overtime or second-shift work

---

[1] Moreover, in her Proposed Findings of Fact, Koch does not identify the title of any of the positions to which she unsuccessfully applied. *See* Pl.'s Prop. Find. of Fact and Conclusions of Law ("Pl.'s Br.") at 3–5, Doc. No. 90. Nor did counsel for Koch identify any unlawfully denied promotions beyond business team leader at oral argument.

5

tied to the position would violate her MS restrictions. Trial Tr. Dec. 13, 2017, at 11–13; Trial Tr. Dec. 15, 2017, at 210–13. The hiring manager explained to her that the chassis position was "almost the same" as the cab position to which she applied. Trial Tr. Dec. 13, 2017, at 10. The position was primarily an office job, any chassis line duties were located far away from that line's heat source, she only needed a general knowledge of the chassis, second-shift work was very rare, and regardless, Mack would accommodate her second-shift restrictions. Trial Tr. Dec. 15, 2017, at 199, 208–13. Nevertheless, Koch rejected the hiring manager's promotion offer for the product introduction engineer – chassis position. *Id.* at 214–15. The successful candidate for the production introduction engineer – cab position earned a $21,063 salary, and there is no evidence as to the salaries of the successful production introduction engineer – chassis candidate or any other Mack employee with that title. *See* Pl.'s Ex. 40.

F. <u>Koch's Salary History</u>

The following table summarizes Koch's annual salary and merit raise history between her arrival at the Macungie plant in May 2010 and this case's December 2017 trial:

| Period | Months | Monthly Salary | Annual Salary | Percent Raise Over Previous Salary |
|---|---|---|---|---|
| May 17, 2010 – Dec. 31, 2010 | 7.5 | $5,000.00 | $60,000.00 | N/A |
| Jan. 1, 2011 – Mar. 31, 2012 | 15 | $5,162.50 | $61,950.00 | 3.25% |
| Apr. 1, 2012 – Mar. 31, 2013 | 12 | $5,627.13 | $67,525.50 | 9.00% |
| Apr. 1, 2013 – Mar. 31, 2014 | 12 | $5,866.28 | $70,395.33 | 4.25% |
| Apr. 1, 2014 – Mar. 31, 2015 | 12 | $6,056.93 | $72,683.18 | 3.25% |
| Apr. 1, 2015 – July 31, 2015 | 4 | $6,329.49 | $75,953.92 | 4.50% |
| Aug. 1, 2015 – Mar. 31, 2017 | 20 | $6,583.33 | $79,000.00 | 4.01% |
| Apr. 1, 2017 – Nov. 30, 2017 | 7 | $6,813.75 | $81,765.00 | 3.50% |

Trial Tr. Dec. 12, 2017, at 59; Trial Tr. Dec. 13, 2017, at 81, 84–88; Pl.'s Ex. 9; Def.'s Ex. 18. Koch did not receive a merit raise in the spring of 2016 because she had already received a raise upon her lateral transfer to the sales engineer position in August 2015. Trial Tr. Dec. 13, 2017, at 95–96; Trial Tr. Dec. 15, 2017, at 172–73. While a Mack human resources representative

6

mistakenly included a provision in Koch's sales engineer offer letter stating she would be eligible for a 2016 merit increase, contemporary male hires to the sales engineer position did not receive a raise either. Trial Tr. Dec. 15, 2017, at 172–75. Therefore, the court finds that the jury did not conclude that Mack unlawfully denied Koch a merit raise in 2016.

### G. Business Team Leader Comparator Salaries

With respect to the salary Koch would had received but for Mack's failure to promote her to business team leader, the record contains four possibilities. First, Tosh earned a salary of between $110,000 and $115,000 in 2015. Trial Tr. Dec. 13, 2017, at 211. He was a business team leader (or equivalent position) at Mack since 2005, before which he worked in the paint department at General Motors for 12 years. *Id.* at 187, 228. Second, Brad Ibach ("Ibach"), the newest addition to the group of business team leaders in assembly, earned $82,000 or $83,000 after his promotion to business team leader on second shift in 2013.[2] *See* Trial Tr. Dec. 18, 2017, at 106–07, 125–26. Like Koch, Ibach was a production supervisor before his promotion to business team leader in 2013. *Id.* at 107–108, 115–16, 150, 152. Third, Koch provided her damages expert with a written damages "guesstimation" stating that the average business team leader salary was $100,000, presumably as of December 2014. *See* Trial Tr. Dec. 13, 2017, at 44, 172–73; Pl.'s Ex. 67. The foundation for the $100,000 figure is unclear. And fourth, Koch's

---

[2] While there was uncertainty at trial as to the accuracy of the $82,000 to $83,000 range, these figures more likely than not represent Ibach's true starting business team leader salary. Leroy Coleman, the business unit manager to whom all business team leaders in assembly report, testified to the $82,000 to $83,000 range at trial:

    Q:    . . . Do you recall what you paid Brad Ibach when he came in as a business team leader?
    A:    I do not. I wouldn't target specific, but I would say somewhere around $82 or $83,000.
    Q:    $82 or 83,000 was what--
    A:    That's correct.
    Q:    --his starting as business team leader was?
    A:    Yes.

Trial Tr. Dec. 18, 2017, at 125–26. Coleman's testimony that he "d[id] not" recall Ibach's entering business team leader salary gives the court pause in accepting the range he ultimately provides. However, his testimony on this point is nevertheless credible for four reasons: (1) immediately after stating he did not recall Ibach's salary, Coleman proceeded to provide a fairly specific salary range, (2) his testimony that he "wouldn't target specific," suggests he simply did not know the exact dollar figure of Ibach's salary, (3) Coleman was Ibach's immediate supervisor and would therefore have direct, personal knowledge of Ibach's salary, and (4) Coleman affirmed the salary range upon re-questioning. *See id.*; Trial Tr. Dec. 12, 2017, at 63–64.

7

expert used $123,500 as a comparator salary to calculate damages. Trial Tr. Dec. 14, 2017, at 81. He reached that figure by averaging two salaries for non-business team leader positions to which Koch had unsuccessfully applied: $147,000 for the KOLA structure chief engineer, and $100,000 for the sales process & systems training manager. *Id.* at 81, 134; *see also* Pl.'s Ex. 40. The record contains no evidence as to the salaries and backgrounds of the remaining 2014 business team leaders in assembly: Shay, Duchala, Dan Daley ("Daley"), and Pat McCue ("McCue"). *See* Trial Tr. Dec. 13, 2017, at 144–45.

### H. The Jury Verdict

Following a trial that concluded on December 19, 2017, the jury rendered a verdict in favor of Koch as to her gender discrimination and retaliation claims under Title VII and the PHRA. Trial Tr. Dec. 19, 2017, at 129–30, Doc. No. 104. The jury awarded Koch $37,500 in compensatory damages for each of her gender discrimination and retaliation claims, totaling $75,000. *Id.* at 130–31. In an advisory capacity, the jury awarded $82,000 in back pay and $518,000 in front pay. *Id.* at 131.

### II. CONCLUSIONS OF LAW

### A. Availability Of Back Pay, Front Pay, And Compensatory Damages Under Title VII

Title VII permits a meritorious plaintiff to recover back pay and any other equitable relief the court deems appropriate:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1). "Any other equitable relief" encompasses front pay. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 850–54 (2001). The Civil Rights Act of 1991

8

("1991 Act") expanded recovery to permit compensatory damages that include "'future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 (3d Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 253 (1994) (quoting 42 U.S.C. § 1981a(b)(3))).

### B. The Court's Role In Determining Back Pay And Front Pay

Because Title VII back pay and front pay are equitable remedies determined by the court, a jury's role is merely advisory—that is, not binding—as to these damages. *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 78 n.1 (3d Cir. 2009) (citing *Pollard*, 532 U.S. at 849–50); *Wilson v. Prasse*, 463 F.2d 109, 116 (3d Cir. 1972).[3] In contrast, the jury determines the amount of compensatory damages awarded because the 1991 Act permits a plaintiff seeking compensatory damages to request a jury trial. *Spencer*, 469 F.3d at 316 (citing 42 U.S.C. § 1981a(c)(1)). Accordingly, the court's instant factual findings and conclusions of law pertain only to the proper calculation of back pay and front pay to which Koch is entitled. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

### C. Back Pay Purpose, Burden, Certainty, And Calculation Method

"Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." *Donlin*, 581 F.3d at 84 (citation omitted). While there is a general presumption in favor of a back pay award, it "is not an automatic or mandatory remedy, but one which the courts may invoke at their equitable

---

[3] In her Proposed Findings of Fact and Conclusions of Law, Koch states that, as a matter of law, "[a] jury's front pay award must be afforded deference," "[a]bsent wild speculation by the jury, an award of front pay will not be set aside," and "[i]t is well accepted that a court will not inquire into the calculation methods employed by the jury during its deliberations." Pl.'s Br. at 10–11 (citations omitted). Each of the cases cited by Koch in support of these propositions involve materially distinguishable causes of action (mostly under 42 U.S.C. §§ 1981 and 1983) and, as counsel for Mack indicated at oral argument, do not involve advisory juries.

discretion." *Id.* (quotation marks and citations omitted); *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995). A plaintiff must prove entitlement to back pay by a preponderance of the evidence. *See Pickens v. Se. Pa. Trans. Auth.*, No. CIV. A. 15-1489, 2017 WL 3722427, at *3 (E.D. Pa. Aug. 29, 2017) ("[B]ack pay cannot be awarded from thin air. A back pay remedy must be specifically tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices." (quotation marks and citations omitted)). The plaintiff must also establish the appropriate back pay amount "with reasonable certainty." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 821 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 198 (2016) (citations omitted). Nevertheless, the wrongdoer, not the victim, bears the risk of uncertainty inherent in projections of lost income. *Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 746–47 (3d Cir. 1989).

"Interim earnings . . . by the person . . . discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). Thus, a proper back pay award equals the difference between the plaintiff's earned wages and the wages the plaintiff would have earned absent discrimination. *Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1119–20 (3d Cir. 1988) (citation omitted); *see also Weiss v. Parker Hannifan Corp.*, 747 F. Supp. 1118, 1132 (D.N.J. 1990) (stating back pay award should also include any benefits the plaintiff would have received absent discrimination).

In determining what the plaintiff would have earned absent discrimination, "a Title VII plaintiff must choose similar employees against whom to compare herself" rather than "pick[ing] and choos[ing] a damages comparator." *Donlin*, 581 F.3d at 90 (alterations to original) (analogizing damages comparators to liability comparators). In *Donlin*, for example, the Third Circuit affirmed the district court's comparator decision because the plaintiff and comparator worked the same shift and worked similar amounts of overtime, both of which affected

compensation. *Id.* Although the comparator had 15 years tenure, unlike the plaintiff, the defendant employer did not increase salaries based on seniority. *Id.* Moreover, the nine men hired over the plaintiff had incomparable "idiosyncratic employment histories," in that they had quit, died, refused overtime, worked different shifts, or had long periods of disability. *Id.* Thus, rather than cherry-picking, the district court had properly chosen a similarly situated comparator relative to alternatives.

### D. The Appropriate Business Team Leader Comparator

Here, Ibach is the appropriate comparator because, of the limited available comparator evidence, he was most similarly situated to Koch. Like Koch, Ibach was a production supervisor before his business team leader promotion. As of December 2014, he was the newest addition to the small cadre of business team leaders in assembly, promoted approximately a year prior in 2013. With that limited time lapse between Ibach's and Koch's hypothetical promotion, Koch was likely to receive a similar entry salary. While Ibach worked second shift, and Koch would have worked first, there is no evidence in the record that Mack paid business team leaders differently based on shift. Ideally, the record in this case would include more evidence of Ibach's work history with Mack—prior production supervisor salary, years of service, performance reviews, and merit raises—to better inform his fit as a business team leader comparator. By December 2014, Koch earned a salary of $72,683.18 as a production supervisor, had worked for Mack for 17 years, received consistently positive performance reviews, and received consistent annual merit raises. Perhaps Ibach had weaker or stronger pre-business team leader credentials, or perhaps Mack starts business team leaders at a set salary regardless of experience. The record is silent on these questions. But based on the available evidence, Koch would have likely received a business team leader salary similar to that of Ibach.

Each of the remaining three business team leader salary possibilities in the record has limited evidentiary value or is unrepresentative of the salary Koch was likely to receive. First, Tosh's 2015 salary of between $110,000 and $115,000 reflects ten years of experience in the business team leader position. Unlike the *Donlin* comparator who did not receive raises based on experience, there is no evidence here that Tosh's or other business team leaders' salaries remained static over time. On the contrary, it appears that annual performance reviews and merit raises were the norm at the Macungie plant. For her part, Koch had no prior experience as a business team leader other than covering for Tosh for a few months. She therefore would have likely received a significantly lower salary than Tosh as a business team leader. Although Tosh was the sole cab line business team leader, and Koch would have assumed that position, there is no evidence that Mack maintained separate business team leader salaries based on, for example, supervisory differences between the cab line and other lines.[4] In all, using Tosh as the comparator here would represent the sort of "picking and choosing" against which the *Donlin* court counseled. Second, Koch's $100,000 "guesstimation" appears to lack any foundation because there is no evidence she had insight into actual business team leader salaries. Third, the $123,500 benchmark calculated by Koch's expert is improper because it simply averages two positions to which Koch unsuccessfully applied, neither of which was business team leader. In sum, Ibach is the only appropriate comparator in this case.

The rejection of Koch's proposed salary benchmarks is a case of Koch failing to meet her burden of proof as to damages rather than a discrimination victim bearing the risk of income projection uncertainties. The record lacks insight into how Mack determines entering business team leader salaries; the quality and quantity of work experience impacting salaries; actual salaries, qualifications, and relevant experiences of the business team leaders other than Tosh

---

[4] Koch did not introduce evidence of any business team leaders' salaries other than Tosh.

and Ibach; and salary differences between different shifts and lines. While the introduction of evidence as to all of these points was not a requirement for Koch to meet her damages burden, the silence as to all of these points suggests that a salary commensurate with Tosh's experience and work history is insufficiently contextualized for comparator purposes. And whereas the Third Circuit in *Donlin* affirmed the comparator by reasoning that alternatives in the record were inferior choices, Koch's comparator evidence fails to offer meaningful alternatives altogether. That Koch's hypothetical business team leader salary is inherently uncertain does not require acceptance of speculative, methodologically unsound, or cherry-picked benchmarks.[5]

### E. The Appropriate Back Pay Length

Mack suggests several possible cutoffs for Koch's entitlement to back pay following Tosh's relocation in December 2014: (1) Koch's failure to pursue the product introduction engineer – chassis position in March 2015, (2) Koch's decision to transfer out of the Macungie plant in July 2015, (3) Tosh's return to his business team leader position overseeing the cab line in September 2015, (4) Koch's failure to pursue the lead sales engineer position in July 2017, or (5) Koch taking disability leave in October 2017. *See* Def.'s Prop. Find. of Fact and Conclusions of Law ("Def.'s Br.") at 7–12, Doc. No. 92. The following discusses each possible cutoff in turn, ultimately finding that Tosh's return terminates Koch's entitlement to back pay.

Turning first to Koch's possible failure to mitigate her damages by rejecting the product introduction engineer – chassis promotion offer in the spring of 2015, Mack failed to introduce evidence of that position's salary. Accordingly, the record does not support a finding that the

---

[5]At oral argument, counsel for Koch argued against using Ibach as the comparator because of the sparse record as to his work background. Again, although a preponderance of the evidence supports using Ibach as a comparator, the record would ideally contain more evidence on the comparability of Ibach's and Koch's work history. However, without Mack's introduction into evidence of Ibach's salary profile, the record would not permit the selection of a reasonably certain salary figure for back pay calculations. *See Szeinbach*, 820 F.3d at 821 (indicating that a Title VII plaintiff must "prove her entitlement to back pay and establish the appropriate amount with reasonable certainty," and "[i]f the plaintiff fails to offer such proof, then an award of back pay is not warranted." (citations omitted)).

13

product introduction engineer – chassis position offered Koch substantially equivalent work. *See Booker*, 64 F.3d at 864–66 (explaining that to prove a discrimination victim failed to mitigate damages, the burden is on the employer to prove that substantially equivalent work, partially entailing compensation, was available).

Next, Koch's entitlement to back pay does not terminate when she left the Macungie plant in July 2015 because gender discrimination motivated her transfer. In arguing to the contrary, Mack selectively quotes Koch's testimony that she "could not deal with what was going on in the plant anymore. It was evident there were no more changes. It was still making my MS worse, with my legs and everything else. I wanted out." *See* Def.'s Br. at 9 (quoting Trial Tr. Dec. 13, 2017, at 23). Put in its proper context, Koch's testimony clarifies that she "could not deal with" the *gender discrimination* she associated with Macungie, "no more changes" refers to a lack of women in management at Macungie, and it was the stress of pursuing her discrimination complaints that made her MS worse. In other words, Mack's promotion of Koch to business team leader—the failure of which is the primary manifestation of gender discrimination the jury found in this case—would have obviated her articulated reasons for leaving Macungie.

Mack's argument that Koch's entitlement to back pay ends when she left Macungie also fails because the record supports the inference that business team leaders spend significant time in an office environment. As discussed above, business team leaders appear to have offices in which they completed paperwork, created charts and graphs, and attended meetings. Thus, even if a change in physical environmental working conditions was Koch's primary motivation for leaving Macungie, she would have received a similar change in environment absent Mack's failure to promote her. As a result, Koch's entitlement to back pay continues beyond July 2015 when she transferred out of the Macungie plant.

Tosh's return to his traditional role as business team leader over the cab line is the appropriate back pay cutoff for three reasons. First, Koch herself testified that if Tosh's position were to be temporarily filled—as it was, by Shay—then she should have the opportunity to fill it *temporarily*. Second, had Mack promoted Koch to fill Tosh's position until his return from paint, it is unlikely that Koch would have then transferred to an alternative business team leader position. Even though Duchala's retirement created a business team leader vacancy on first shift around the time that Tosh returned, that position oversaw the chassis line. As evidenced by her denial of the product introduction engineer – chassis position, Koch was unwilling to work a position tied to the chassis line due to her inexperience and a belief that the heat from the chassis line would exacerbate her MS. Even if Mack had been willing to relocate the other first-shift business team leader, Aaron Shay, to accommodate Koch, that job would have also involved overseeing the chassis line. Because Koch was unwilling or incapable of performing any business team leader position other than Tosh's position, and Tosh eventually returned, it is difficult to imagine an arrangement in which Koch remained a business team leader in perpetuity. And indeed, Koch presented no evidence of what that arrangement would resemble.

Third, permitting Koch to receive back pay beyond Tosh's return would elevate Koch into a better position than she would have been absent Mack's failure to promote her. Her back pay remedy must be specifically tailored to expunge only the actual consequences of Mack's failure to promote her, and any back pay beyond Tosh's return is speculative. Accordingly, Koch's entitlement to back pay begins and ends with Tosh's departure and return: December 2014 to September 2015.[6]

---

[6] With a back pay cutoff in September 2015, the court need not, and does not, make findings as to subsequent possible cutoffs: (1) whether Koch failed to mitigate damages by declining to pursue the lead sales engineer position in July 2017, and (2) the extent to which Koch taking disability leave in October 2017 impacts her entitlement to back pay.

### F. Back Pay Calculation

The table immediately below summarizes the monthly difference between Koch's earned wages and the wages she would have earned as Tosh's temporary replacement:

| Month | Koch's Earned Wages | Koch's Wages as Tosh's Temporary Replacement | Back Pay Award |
|---|---|---|---|
| Dec. 2014 | $ 6,056.93 | $ 6,927.01 | $ 870.08 |
| Jan. 2015 | $ 6,056.93 | $ 6,927.01 | $ 870.08 |
| Feb. 2015 | $ 6,056.93 | $ 6,927.01 | $ 870.08 |
| Mar. 2015 | $ 6,056.93 | $ 6,927.01 | $ 870.08 |
| Apr. 2015 | $ 6,329.49 | $ 6,927.01 | $ 597.52 |
| May 2015 | $ 6,329.49 | $ 6,927.01 | $ 597.52 |
| June 2015 | $ 6,329.49 | $ 6,927.01 | $ 597.52 |
| July 2015 | $ 6,329.49 | $ 6,927.01 | $ 597.52 |
| Aug. 2015 | $ 6,583.33 | $ 6,927.01 | $ 343.68 |
| Sept. 2015 | $ 6,583.33 | $ 6,927.01 | $ 343.68 |
| **Totals** | **$62,712.34** | **$69,270.10** | **$6,557.76** |

In determining what Koch would have earned as Tosh's temporary replacement, the table splits into monthly increments Ibach's 2013 salary averaged to $82,500 and then adjusted for 2014 inflation, equaling $83,124.11. *See* U.S. Bureau of Labor Statistics, CPI Inflation Calculator (May 23, 2018), https://www.bls.gov/data/inflation_calculator.htm. Her salary as Tosh's temporary replacement assumes ineligibility for a 2014 merit raise during 2015, based on Koch's minimal post-promotion 2014 work history and her actual ineligibility for a 2015 merit raise in the spring of 2016 after her sales engineer transfer. While Koch is also eligible for any extra benefits she would have received as Tosh's replacement, any proof on benefits in the record contains insufficient evidentiary value. In all, Koch is entitled to $6,557.76 in back pay.

Koch is also entitled to prejudgment interest on her back pay award. "The award of prejudgment interest . . . serves to compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned" absent discrimination. *Booker*, 64 F.3d at 868. Unless the award would result in "unusual inequities," a strong presumption exists in favor of prejudgment interest. *Id.* District courts may use the applicable rate in the federal post-

judgement interest rate statute, 28 U.S.C. § 1961(a), for guidance. *Fillman v. Valley Pain Specs., P.C.*, No. CIV. A. 13-1609, 2016 WL 192656, at *5 (E.D. Pa. Jan. 15, 2016) (citations omitted). Section 1961(a) directs courts to calculate interest in the post-judgment context "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." § 1961(a). The *Fillman* court explains that courts in this district have modified this approach by simply "utilizing the T-bill rate available at the end of each year, rather than applying the rate available at the date of judgment." 2016 WL 192656, at *5 (quoting *O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 446 (E.D. Pa. 2000)). The following table follows this approach, accounting for partial year periods:

| Period | Earned Back Pay | Prior Accrued Interest and Back Pay | 1-Year T-Bill Rate[7] | Interest | Total |
|---|---|---|---|---|---|
| Dec. 2014 | $ 870.08 | $ 0.00 | 0.20% | $ 0.15 | $ 870.23 |
| 2015 | $5,687.68 | $ 870.23 | 0.63% | $ 41.31 | $6,599.22 |
| 2016 | $ 0.00 | $6,599.22 | 0.84% | $ 55.43 | $6,654.65 |
| 2017 | $ 0.00 | $6,654.65 | 1.65% | $ 109.80 | $6,764.45 |
| Jan. 2018 – May 2018 | $ 0.00 | $6,764.45 | 2.08% | $ 58.63 | $6,823.08 |

In all, after adding the total prejudgment interest of $265.32 to the unadjusted back pay award of $6,557.76, Koch is entitled to a final back pay award of $6,823.08.

### G. Entitlement To Front Pay

"Though back pay makes a plaintiff whole from the time of discrimination until trial, a plaintiff's injury may continue thereafter. Accordingly, courts may award front pay where a victim . . . will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied." *Donlin*, 581 F.3d at 86. Here, because Koch's back pay injury is limited to the period of Tosh's relocation to the paint department, and Tosh returned years prior

---

[7] *See* Board of Governors of the Federal Reserve, Data Download Program, H.15 Selected Interest Rates (May 23, 2018), https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.

to the trial in this case, Koch is not entitled to front pay.  Even if Koch were correct that a court should afford deference to a jury's advisory front pay award as a matter of law, the $518,000 front pay award here is wholly speculative given that Mack failed to promote Koch for a position that was, by Koch's own admission, time-limited.

### III.    CONCLUSION

The jury found Mack liable for gender discrimination and retaliation under Title VII and the PHRA for failing to promote Koch to Tosh's temporarily vacated business team leader position.  Title VII back pay and front pay awards are equitable remedies determined by the court, and the court now finds that Koch is entitled to back pay equaling the difference between her actual earned wages and Ibach's inflation-adjusted starting business team leader salary.  Because Mack would have only promoted Koch temporarily, the duration of Tosh's relocation to the paint department, her back pay award is limited to the period between December 2014 and September 2015.  Including prejudgment interest, Koch is entitled to a back pay award of $6,823.08 and no front pay, advisory jury awards in excess of those amounts notwithstanding.  A separate order follows.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.